**N. JONAS & CO., INC. Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 81–1682.

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 1981.

Decided Dec. 10, 1981.

As Amended Dec. 22, 1981.

---

H. Ronald Klasko (argued), Philadelphia, Pa., for Petitioner; Abraham & Loewenstein, Philadelphia, Pa., of counsel.

Carol E. Dinkins, Asst. Atty. Gen., Donald W. Stever, Jr., Elizabeth Yu (argued), Attys., Dept. of Justice, Washington, D. C., Michael F. Vaccaro, Philadelphia, Pa., John C. Ulfelder, Washington, D. C., Attys., Environmental Protection Agency, for respondent.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and McCUNE,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

N. Jonas & Co. (Jonas) petitions for review of a final order of the Environmental Protection Agency (EPA) assessing a $2,500 civil penalty against appellant for failure to register its product *Scorch* as a pesticide under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* This Court has jurisdiction to review the Agency's actions pursuant to Section 16(b) of the Act, 7 U.S.C. § 136n(b). We conclude that the EPA order is supported by substantial evidence and we affirm.

Jonas produces and distributes chemicals for swimming pool sanitation and maintenance. One of these products, *Scorch*, is Jonas' repackage of the Pennwalt Corporation's chemical *Sentry*. *Sentry* is registered with EPA as a bactericide and oxidizing agent. 7 U.S.C. § 136a(a). It is composed of 65% calcium hypochlorate, providing free chlorine in water, and 35% inert ingredients.

In September 1975 Jonas filed an application to register *Scorch* as a pesticide. Regulations enacted contemporaneously by requiring producers to submit the necessary data with their application, had made it more difficult to obtain new registrations. 40 C.F.R. § 162.6 *et seq.* To support the

* Hon. Barron P. McCune, United States District Judge for the Western District of Pennsylvania, sitting by designation.

registration, Jonas relied on its supplier Pennwalt, which furnished the needed information to the EPA in November 1975. By January 1976, Jonas concluded that the new regulations had effected a "freeze" on new registrations. Thereupon, on the basis of a cursory and unofficial inquiry of the EPA,[1] it started to market *Scorch* without registration. The unregistered label eschewed pesticidal claims and contained a disclaimer stating "SCORCH IS NOT TO BE USED FOR DAILY DISINFECTION OR ALGAE CONTROL OF YOUR POOL."

In mid-February 1976, the EPA product manager for chlorinated products became aware of the unregistered marketing and informed Jonas that it ought to register *Scorch* as a pesticide. The company, nevertheless, continued to make shipments under the unregistered label until mid-June 1976. Meanwhile, on March 1, 1976, it filed a supplemental registration for *Scorch* based on Pennwalt's product "Pennswim Big Shot." 40 C.F.R. § 162.6(b)(4). Approval was granted on April 7, 1976 and the company started marketing *Scorch* with a label indicating that *Scorch* could serve as an algaecide as well as oxidizer.[2] The company thus, for a two-month period, distributed *Scorch* in two types of packages. The registered *Scorch* label made algaecidal claims and had an environmental warning while the unregistered *Scorch* label did not, otherwise the registered and unregistered *Scorch* packages were undifferentiable.

The EPA, in June 1976, initiated an enforcement action seeking civil penalties against Jonas for marketing *Scorch* without registration. A hearing was held in Philadelphia before Administrative Law Judge Nissen on March 14–17, 1978. The ALJ issued his Initial Decision, I.F. & R. No. III–121C, finding *Scorch* to be a pesticide and assessing Jonas a $2,500 penalty for failure to register under FIFRA. This was affirmed by the EPA Regional Judicial Officer in a Final Decision and Order issued June 28, 1979, and Jonas petitioned for review.

While the petition for review was pending, Jonas discovered EPA Policy and Criteria Notice 2050.1 which it considered to be favorable. This Court granted the EPA's motion for remand to determine the validity of PCN 2050.1 and its impact on the EPA order. A hearing was held on July 14, 1977 before ALJ Nissen. He issued an Initial Order on Remand adopting his July 27, 1978 decision by reference and determining that PCN 2050.1 did not change the earlier conclusions. (R.App:1). The Regional Judicial Officer in turn affirmed the ALJ in a Final Decision and Order dated April 9, 1981. (R.App:13).

Jonas filed this second petition for review asserting that *Scorch* is an oxidizing agent intended to clean out organic wastes in a pool and is not a pesticide; that the EPA applied the wrong legal standard; that there is no substantial evidence to support the EPA's order; that the EPA was estopped from proceeding against Jonas; and that the penalty was excessive.

The fulcrum of this case is whether *Scorch* is a pesticide. If it is, then Section 3(a) of the Act, 7 U.S.C. § 136a(a), clearly mandates registration. The statute defines pesticide:

> The term "pesticide" means (1) any substance or mixture of substances intended for preventing, destroying, repelling or mitigating any pest, and (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or disiccent . . .

7 U.S.C. § 136(u). The Administrator has published regulations under FIFRA elaborating on the statutory definition:

> (a) *Determination of intent of use.* A substance or mixture of substances is a pesticide under the Act if it is intended

---

1. The company is unable to identify the person with whom it spoke. It merely indicates that "someone" at the EPA informed it that the product need not be registered if the label disclaimed pesticidal use.

2. Pennwalt Corp. had registered "Pennswim Big Shot" as a pesticide and used a label making algaecidal claims. Jonas, by undertaking a supplemental registration, was required to make the self same claims for its product.

for preventing, destroying, repelling or mitigating any pest. (See Section 2(u) of the Act and § 162.3(ff).) Such intent may be either expressed or implied. If a product is represented in any manner that results in its being used as a pesticide, it shall be deemed a pesticide for the purposes of the Act and these regulations.

(b) *Products considered to be pesticides.* A product will be considered to be a pesticide if:

(1) Claims or recommendations for use as a pesticide are made on the label or labeling of the product including, but not limited to, collateral advertising such as publications, advertising literature which does not accompany the product, or advertisements by radio or television;

(2) Claims or recommendations for use as a pesticide are made verbally or in writing by representatives of the manufacturer, shipper, or distributor of the product;

(3) The product is intended for use as a pesticide after reformulation or repackaging; or

(4) The product is intended for use both as a pesticide and for other purposes.

40 C.F.R. § 162.4. EPA has also declared algae and bacteria to be pests, 40 C.F.R. § 162.14(b)(4); the company does not dispute those characterizations.

EPA takes the statute and regulations to mean that a product is a pesticide if a reasonable consumer—given the label, accompanying circulars, advertising representations and the collectivity of circumstances—would use it as a pesticide. The fact that the product may also have other uses does not affect the need to register. EPA thus imputes this objective standard to the intent focused language of 7 U.S.C. § 136(u). Jonas, on the other hand, would have the issue turn on the subjective intent of the company as gleaned from the label of the product and the representations made by it.[3] It relies on PCN 2050.1 which states in part:

A substance shall be considered a pesticide by the intent of the manufacturer, seller or distributor, as expressed or implied via labeling claims and recommendations, or in advertising material.

A solvent or other material shall not be considered a pesticide simply because it may be used as such. The intent of the user of the substance shall not be a factor in determining pesticide status under FIFRA.

(R.App:12). Since the Notice specifically indicates that the intent of the users of a product not be considered, the company takes issue with EPA's focus on the expectations of the "reasonable consumer." According to the company, PCN 2050.1, by mandating a consideration of the manufacturer or distributor's intent, and by precluding consideration of the user's intent, dictates the subjective standard of intent— i.e., the actual machinations of the company's mind. EPA's position, on the other hand, is that PCN 2050.1 merely clarifies the regulations and insures that a manufacturer or distributor not be held to some whimsical or capricious use to which a consumer may put its product. EPA admits that the intent of the manufacturer, sell-

---

**3.** The company relies heavily on *Gulf Oil v. United States*, 548 F.2d 1228 (5th Cir. 1977), in which the Fifth Circuit determined that a torch fuel with four references to oil of citronella on the label was not a pesticide. In that case the EPA had introduced evidence that, before World War II, oil of citronella was a well known pesticide. The Court, however, discounted this as evidence of present public awareness of the oil as a pesticide. The *only* evidence remaining was the bare mention of oil of citronella in the label which was not enough to support a finding of pesticidal intent. Nowhere did the court indicate that it would re-strict its inquiry to the producer's own label and representations. In fact, it allowed evidence of general public awareness of pesticidal effect to be included but decided that the evidence adduced was not sufficiently probative. Nor does the case support the position that intent is to be subjective. The court held that the product was not a pesticide because the public would not extrapolate from the mention of oil of citronella on the label to infer pesticidal effect—not because the company had avoided making pesticidal claims for the oil. There was no examination of the company's own intentions in manufacturing the torch fuel.

er or distributor is controlling but reiterates that PCN 2050.1 does not change the objective standard: the company intends those uses to which the reasonable consumer will put its products.

■ We think EPA is correct. *Cf. National Nutritional Foods Association v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977) (FDA not bound by manufacturer's subjective claims of intent in assessing whether product is intended as drug). *See generally, United States v. 681 Cases ... Kitchen Klenzer*, 63 F.Supp. 286, 287 (E.D.Mo.1945). The Act, the regulations and PCN 2050.1 focus the inquiry on the intended use—implied or expressed. We take this to mean the use which a reasonable consumer would undertake. The subjective intent standard would emasculate the Act. A manufacturer or distributor cannot avoid the reach of the Act by pointing to its own subjective intent that a product have a given use. Even if it were possible to gauge this subjective intent, the public weal requires that even those who inadvertently produce goods which the public perceives as pesticidal be subject to the jurisdiction and regulations of the EPA. *Cf. United States v. An Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 792, 798, 89 S.Ct. 1410, 1415, 1418, 22 L.Ed.2d 726 (1968) (definition of drug to be given liberal interpretation in light of remedial purpose of Federal Food, Drug and Cosmetics Act). An objective standard, by drawing on the reasonable expectations of potential users, balances a manufacturer's interest in not being held responsible for the unusual uses of its products with the need to protect the public.

In determining intent objectively, the inquiry cannot be restricted to a product's label and to the producer's representations. Industry claims and general public knowledge can make a product pesticidal notwithstanding the lack of express pesticidal claims by the producer itself. Labeling, industry representations, advertising materials, effectiveness and the collectivity of all the circumstances are therefore relevant.

■ Having determined that EPA applied the proper legal standard,[4] our task becomes the more limited one of determining whether the agency's order is supported by substantial evidence on the record as a whole. 7 U.S.C. 136n(b); 5 U.S.C. 706. *See Consolo v. Federal Maritime Commission*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *see generally Universal Camera Corporation v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The ALJ's Initial Decision and Initial Decision on Remand meticulously map the evidence presented, explain the rationales and indicate the bases for the various findings. The Agency determined that, as packaged, the supplementally registered and unregistered *Scorch* appeared so similar that the algaecidal claims on the supplementally registered label would affect the uses of the unregistered product.[5] The ALJ had evidence of the effectiveness of *Scorch* as a bactericide and algaecide. There was uncontroverted testimony that the oxidization of organic wastes would mitigate algae and bacteria by removing their nutrients. Moreover, the pool maintenance literature clearly indicated that oxidizing agents had pesticidal effects. The evidence also showed that algae and bacteria would increase with heavy rain and warm temperatures. The instructions to increase the dosage and frequency of *Scorch* treatments after heavy rains and in warm weather implied, therefore, pesticidal functions. Though the unregistered *Scorch* label contained a disclaimer of algaecidal powers, the ALJ felt that, given the weight of the other evidence, it was ineffective. All this

4. The company also asserts that the EPA determined that *Scorch* is a pesticide only because it contains chlorine. There is some support that these proceedings were started by the EPA based on such a determination, but the ALJ's decision—which is what we review here—does not use the "chlorine-therefore-pesticide" standard.

5. Appellant contends that the real issue in this case is a claim of misbranding. Whatever the merits of the claim, the ALJ properly determined that appellant waived all defenses based on supplemental registration.

more than satisfies the requirements for review. Whether we would have reached the same conclusions on this evidence were we to consider the matter *ab initio* is not determinative. It suffices that EPA's judgment is supported by substantial evidence.

 Jonas argues that EPA was estopped from bringing this proceeding. It is difficult to estop the United States. *Walsonavich v. United States*, 335 F.2d 96 (3d Cir. 1964). The government is the trustee of the public welfare and the actions of an individual officer cannot easily prevent the government from discharging its obligations to the public. *See United States v. California*, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947); *see generally, American Dredging Company v. Selleck*, 556 F.2d 180 (3d Cir. 1977). Extreme situations where an affirmative act of misconduct inflicts grave injustice on the claimant may warrant estoppel. *See Rucker v. Saxbe*, 552 F.2d 998 (3d Cir.), *cert. denied*, 434 U.S. 919, 98 S.Ct. 392, 54 L.Ed.2d 275 (1977); *see generally, Moser v. United States*, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 729 (1951). That is not the case here, for we find no misbehavior by EPA: the Agency did not engage in a discriminatory persecution of Jonas;[6] whatever unofficial and undocumented advice the company received from "someone" at EPA on the propriety of marketing *Scorch* without registration cannot bind the Agency; and any delay in the registration of *Scorch* was due to properly enacted new regulations and the company's remissness in providing data. Moreover, Jonas neither waited for a reasonable period after filing its application to see whether it would get approval nor did it apply for a supplemental registration—an avenue that was as open to it in January 1976 as in March 1976. Finally, assessment of a $2,500 penalty—a figure well within Agency guidelines, 7 U.S.C. § 136*l*(a)(4), 39 Fed.Reg. 27711 (1974)—was not arbitrary or capricious, or an abuse of discretion.

The petition for review will be denied and the order assessing a $2,500 penalty affirmed.

---

**6.** There is no evidence that the company was singled out for prosecution. Although a distributor of a competing product, *OxyBrite*, was not cited by EPA, there is no evidence that such inaction was part of a discriminatory pattern of enforcement.