[No. B027715. Second Dist., Div. Seven. Sept. 24, 1990.]

LESLIE'S POOL MART, INC., Plaintiff and Respondent, v.
DEPARTMENT OF FOOD AND AGRICULTURE et al.,
Defendants and Appellants.

CLARE BERRYHILL, as Director, etc., et al., Cross-complainants
and Appellants, v.
LESLIE'S POOL MART, INC., Cross-defendant and Respondent.

**COUNSEL**

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, and Richard J. Magasin, Deputy Attorney General, for Defendant, Cross-complainants and Appellants.

Lewis, D'Amato, Brisbois & Bisgaard, David E. Reynolds and Jana I. Lubert for Plaintiff, Cross-defendant, and Respondent.

**OPINION**

**JOHNSON, J.—**

### FACTS AND PROCEEDINGS BELOW

Leslie's Pool Mart, Inc. (Leslie's) is a wholesaler and retailer of swimming pool equipment and supplies. Some of the supplies it sells are registered with the California Department of Food and Agriculture as pesticides or "economic poisons," under the Economic Poisons Act. (Food & Agr.

Code, § 12751 et seq.)[1] Products so registered must comply with the statutes and regulations governing sale of pesticides and are subject to a special tax assessment under sections 12841 et seq.

The Department of Food and Agriculture and its director are charged with enforcement of the of the Economic Poisons Act including registering and regulating products which fall within the purview of the act and assessing and collecting the special tax assessment authorized by the act.

In December 1981 employees of the Department of Food and Agriculture entered two of Leslie's retail stores and seized and quarantined a product known as Leslie's oxidizer. The director based this seizure on his belief Leslie's oxidizer was an unregistered pesticide whose possession and sale was unlawful under the act. The director did not afford Leslie's an opportunity for a hearing on the merits of the seizure before or after the seizure took place. Leslie's oxidizer was subsequently registered as a pesticide and the quarantine was lifted on the products seized.

In consolidated actions, Leslie's brought suit against the director and the department for declaratory and injunctive relief, a refund of the special tax assessment levied on its oxidizer and other products and for attorney's fees under Government Code section 800. Specifically, Leslie's sought a declaration that its products sold for the mitigation and control of bacteria and algae in swimming pools, including but not limited to the oxidizer, are not pesticides and, therefore, not subject to regulation or taxation under the Economic Poisons Act. Alternatively, Leslie's sought a declaration the tax assessment had been improperly calculated as to its products and that it was entitled to a refund of excess taxes paid. In addition Leslie's sought a declaration the director had violated Leslie's due process rights by seizing and quarantining its product without affording Leslie's the opportunity for a pre- or postseizure hearing. Leslie's claimed entitlement to attorney's fees under Government Code section 800 on the ground the director's registration and taxation determinations and his decision to seize Leslie's oxidizer without a hearing were arbitrary or capricious.

The director filed a cross-complaint against Leslie's for civil penalties based on its sale of an unregistered pesticide, Leslie's oxidizer.[2]

---

[1] All future statutory references are to the Food and Agriculture Code unless otherwise specified.

[2] The trial court granted judgment to Leslie's on the cross-complaint based on its conclusion Leslie's oxidizer is not a spray adjuvant subject to regulation under the Economic Poisons Act.

After a court trial, the court awarded judgment to Leslie's on all its causes of action (except for injunctive relief which was moot by then). The court ordered a tax refund of $354,796 and awarded attorneys' fees under Government Code section 800. The court also awarded judgment to Leslie's on the director's cross-complaint.

## ISSUES ON APPEAL

In this case we are called upon to resolve several issues pertaining to California's regulation and taxation of pesticides. The issues we must decide are: (1) may the state seize and quarantine a substance it believes is being sold or possessed in violation of the Economic Poisons Act without affording the person selling or possessing the substance a hearing on the merits of the seizure before or after the seizure takes place?

(2) Are chemicals sold for the purpose of preventing, destroying, repelling or mitigating bacteria and algae in swimming pools subject to regulation and taxation under the Economic Poisons Act?

(3) Is the special tax assessment on pesticides constitutional as applied to products sold for the purpose of preventing, destroying, repelling or mitigating bacteria and algae in swimming pools; and, if so, was the tax constitutionally applied to Leslie's?

## DISCUSSION

## I. THE DIRECTOR VIOLATED LESLIE'S RIGHT TO DUE PROCESS OF LAW BY SEIZING AND QUARANTINING ITS PRODUCTS WITHOUT AFFORDING LESLIE'S AN OPPORTUNITY TO BE HEARD BEFORE OR AFTER THE SEIZURE.

Acting under the authority of section 12961,[3] the director seized and quarantined 1,240 pounds of Leslie's oxidizer without prior notice and without affording Leslie's the opportunity for a hearing on the merits of the seizure before or after seizing the product. We agree with the trial court's conclusion this seizure was a violation of Leslie's due process rights under the federal and state constitutions.[4]

---

[3] Section 12961 provides: "The director may seize and quarantine any economic poison which is adulterated, or misbranded, or detrimental to agriculture or to the public health, or which is otherwise not in conformity with any provision of this chapter."

[4] The fact the seized product was subsequently returned to Leslie's does not moot Leslie's cause of action for a declaratory judgment on the constitutionality of the seizure. (*Goldin* v.

We advise at the outset our holding on the due process issue is a narrow one: that the director violated Leslie's right to due process under the facts of this case. We do not hold the law under which he acted, section 12961, unconstitutional on its face. The trial court did not hold section 12961 unconstitutional. It only held the director's seizure and quarantine in this case violated Leslie's rights under the due process clauses of the United States and California Constitutions. There might be extraordinary circumstances where an immediate danger to the public health or safety *would* justify seizing and quarantining pesticides without prior notice and hearing. (See discussion, *post*, this page and p. 1532.) Rather than sow doubt and confusion over the director's statutory authority to protect the public and the environment from imminent danger we limit our holding to the facts of the case before us where no extraordinary circumstances appear.[5]

Furthermore, we limit our discussion to the due process issue. Neither Leslie's nor the trial court addressed the question whether Fourth Amendment requirements are applicable to the seizure of pesticides under section 12961 thus we do not address that question here. (But see *New York* v. *Burger* (1987) 482 U.S. 691 [96 L.Ed.2d 601, 107 S.Ct. 2636]; *People* v. *Roehler* (1985) 167 Cal.App.3d 353 [213 Cal.Rptr. 353]; Kress & Iannelli, *Administrative Search and Seizure—Whither The Warrant* (1986) 23 Vill. L. Rev. 705.)

It is undisputed Leslie's had a significant property interest in its swimming pool chemicals and their seizure constituted a taking of property within the purview of the due process clauses of the United States and California Constitutions. (U.S. Const., Fourth Amend.; Cal. Const., art. I, § 7.) The question is not whether Leslie's was entitled to due process but, as it is often put: what process was due? (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593]; *Goldin* v. *Public Utilities Commission, supra,* 23 Cal.3d at p. 662.)

■ We begin with "the basic proposition that in every case involving a deprivation of property within the purview of the due process clause, the Constitution requires some form of notice and a hearing . . . . Absent extraordinary circumstances justifying resort to summary procedures, this

*Public Utilities Commission* (1979) 23 Cal.3d 638, 661, fn. 11 [153 Cal.Rptr. 802, 592 P.2d 289]; *Bryte* v. *City of La Mesa* (1989) 207 Cal.App.3d 687, 690, fn. 3 [255 Cal.Rptr. 64].)

[5]Unlike the statutory scheme reviewed in *Menefee & Son* v. *Department of Food & Agriculture* (1988) 199 Cal.App.3d 774, 783, footnote 6 [245 Cal.Rptr. 166], there is no alternative authority under which the director could seize and quarantine pesticides that pose a danger to the public or the environment. Thus, if we were to strike down section 12961 we would be leaving the public and the environment without protection from an immediate danger posed by a pesticide.

hearing must take place *before* an individual is deprived of a significant property interest." (*Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 458 [121 Cal.Rptr. 585, 535 P.2d 713] [citations omitted; italics in original].)

Among the "extraordinary circumstances" that have justified the government's seizure of property without prior notice and hearing is "the right and duty of the State to protect and guard, as far as possible, the lives and health of its inhabitants . . . ." (*North American Cold Storage Co.* v. *Chicago* (1908) 211 U.S. 306, 315 [53 L.Ed. 195, 199, 29 S.Ct. 101].) In *North American Storage*, the court upheld the power of city food inspectors to act without prior notice and hearing "to forthwith *seize*, condemn and destroy any . . . putrid, decayed, poisoned and infected food which any such inspector may find . . . ." (*Id*. at p. 309 [53 L.Ed.2d at p. 196]; italics in original.) In *Ewing* v. *Mytinger & Casselberry* (1950) 339 U.S. 594 [94 L.Ed. 1088, 70 S.Ct. 870], the court upheld the power of the Food and Drug Administration to seize, without prior notice and hearing, any misbranded article the agency had probable cause to believe was dangerous to health, fraudulently labeled, "or would be in a material respect misleading to the injury or damage of the purchaser or consumer." (*Id*. at pp. 595-596 [94 L.Ed.2d at p. 1091].) The court noted the protection of public health is "[o]ne of the oldest examples [of] the summary destruction of property without prior notice or hearing . . . ." (*Id*. at p. 599 [94 L.Ed.2d at p. 1094].) California, too, has long recognized the public welfare may justify seizing property without prior notice and hearing. See, e.g. *State Savings etc. Bank* v. *Anderson* (1913) 165 Cal. 437, 446 [132 P. 755]: "Summary seizure and liquidation of unsafe banks can fairly and reasonably be justified on the ground of immediate danger to the public welfare in further permitting their business continuance."

Federal and California law on prehearing seizures was summarized by the court in *Phillips* v. *San Luis Obispo County Dept. etc. Regulation* (1986) 183 Cal.App.3d 372, 378 [228 Cal.Rptr. 101]: "Whether special circumstances warrant summary seizure depend upon the nature of the government interest, the need for 'very prompt action,' and the duty of the seizing official under the standards of a narrowly drawn statute." Furthermore, at least under California law, the existence of special circumstances postpones, but does not eliminate, the need for a prompt postseizure administrative hearing. (*Id*. at p. 379.) (See discussion *post*, pp. 1535-1537.)

A. *Failure to Provide Preseizure Hearing*

██ Leslie's products were not seized because they were a threat to the public or to the environment but because they were unregistered in violation

of section 12811.[6] The facts of this case amply demonstrate the lack of exigent circumstances to justify the seizure. The record shows the director knew more than a year before the seizure Leslie's was selling its swimming pool oxidizer without registering it as a pesticide.

In a case directly on point, the court in *Menefee & Son* v. *Department of Food & Agriculture, supra,* 199 Cal.App.3d 774, held the director violated plaintiff's due process rights by failing to provide a hearing before seizing a crop allegedly treated with an unauthorized pesticide because there was no showing of exigent circumstances. The court reasoned: "To be sure contaminated food is a matter which frequently requires emergency seizure. But the challenged statute makes no effort to limit its application to emergency situations and instead broadly applies to any misuse of chemicals without regard to whether an emergency appears. The mere fact that summary seizure may be necessary in some instances does not validate a statute that permits ex parte seizure without any attempt to narrowly draw into focus the extraordinary circumstances in which summary seizure may be required. The facts of this case amply demonstrate this deficiency. Although the department had notice of the use of Thimet and Furadan by plaintiffs in February 1986 and had scientific confirmation of the presence of Thimet and Furadan in the field 6 soil by early March, no action was taken by the department until June 12, 1986. Any claim that this case presents extraordinary circumstances justifying summary seizure would be specious." (*Id.* at p. 782; citations and fn. omitted.) In the present case, the director waited even longer before summarily seizing the offending product from Leslie's. It would be specious to argue that, after allowing Leslie's unregistered oxidizer to be sold for more than a year, exigent circumstance compelled its summary seizure and quarantine.

Another ground sometimes asserted for dispensing with a hearing prior to taking a person's property is that preseizure administrative procedures reduce the chance of error to an insubstantial risk. Thus, courts have approved dispensing with prior hearings when the agency's action is more ministerial than adjudicatory (*Dixon* v. *Love* (1977) 431 U.S. 105, 113 [52 L.Ed.2d 172, 180-181, 97 S.Ct. 1723]; *DiGenova* v. *State Board of Education* (1955) 45 Cal.2d 255, 262 [288 P.2d 862]); when it is more subjective and evaluative than factual (*Board of Curators, Univ. of Mo.* v. *Horowitz* (1978) 435 U.S. 78, 90 [55 L.Ed.2d 124, 135, 98 S.Ct. 948]); when the applicable law provides the agency specific and objective criteria on which to act

---

[6]Section 12811 provides: "Every manufacturer of, importer of, or dealer in any economic poison . . . or a dealer or agent that sells any economic poison which has been registered by the manufacturer or wholesaler, shall obtain a certificate of registration from the department before the economic poison is offered for sale."

(*Hodel* v. *Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 301-302 [69 L.Ed.2d 1, 31-32, 101 S.Ct. 2352]) and when the agency's openness to public scrutiny and the historical absence of abuse of its powers render risk of error minimal. (*Ingraham* v. *Wright* (1977) 430 U.S. 651, 670, 682 [51 L.Ed.2d 711, 729-730, 737, 97 S.Ct. 1401]; and see *Hodel, supra,* 452 U.S. at p. 302, fn. 46 [69 L.Ed.2d at p. 32].)

The director's summary seizure of unregistered products cannot be justified on the basis of an insubstantial risk of error. We recognize the director is not likely to make a mistake about whether or not the product is registered. But the question to be determined before carrying out a seizure under section 12961 is not whether the product is registered as a pesticide but whether it is *required* to be registered as a pesticide. This can sometimes be a complex question of law and fact. (See, e.g., *N. Jonas & Co. Inc.* v. *U.S. Environmental, Etc.* (3d Cir. 1981) 666 F.2d 829; *Gulf Oil Corp.* v. *Environmental Protection Agency* (5th Cir. 1977) 548 F.2d 1228 [registration under parallel federal pesticide law, 7 U.S.C. 136 et seq.]; *People* v. *Worst* (1943) 57 Cal.App.2d Supp. 1028 [136 P.2d 137] [registration under California's Economic Poisons Act.]) As the record in the present case shows, reasonable minds could and did differ over whether Leslie's oxidizer had to be registered as a pesticide. The Department of Food and Agriculture vacillated on the question for over a year. Furthermore, the EPA determined Leslie's oxidizer did not require registration as a pesticide under federal law which defines pesticide similarly to California law and which does require registration of some swimming pool products as pesticides.[7] (*N. Jonas & Co., Inc.* v. *U.S. Environmental, Etc., supra,* 666 F.2d at p. 830.) The director's registration decisions are, therefore, adjudicatory, not ministerial; factual, not subjective; and unguided by specific, objective criteria as evidenced by the record in this case. Operations of the Department of Food and Agriculture are not open to public scrutiny in the same sense as those of a public school (*Ingraham* v. *Wright, supra,* 430 U.S. at p. 670 [51 L.Ed.2d at p. 730]) and we have been directed to no data on the department's abuse of its registration power. Reported cases, however, show the department has overstepped its statutory authority in the past. (See *People* v. *Worst, supra,* 57 Cal.App.2d at p. Supp. 1031; *Pitney-Bowes, Inc.* v. *State of California* (1980) 108 Cal.App.3d 307 [166 Cal.Rptr. 489].)

For the reasons set forth above, we hold the director violated Leslie's right to due process of law when, in the absence of an immediate threat to

---

[7] Title 7 United States Code, section 136(u) defines pesticide as "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, and (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant . . . ." Federal law does not prohibit more extensive regulation of pesticides by the states (7 U.S.C. § 136v(a).) Thus, California may require a product be registered as a pesticide where federal law does not.

the public health or safety or the environment, he seized Leslie's oxidizer without affording Leslie's prior notice and opportunity for a hearing on the grounds for the seizure.

B. *Failure to Provide Postseizure Hearing*

■ We turn now to the question whether Leslie's was afforded a constitutionally adequate postseizure hearing. The director argues the availability of mandamus, or an action for declaratory and injunctive relief, as in the present case, satisfies the due process requirement of a hearing "at a meaningful time and in a meaningful manner." (*Armstrong* v. *Manzo* (1965) 380 U.S. 545, 552 [14 L.Ed.2d 62, 66, 85 S.Ct. 1187].)

While the United States Constitution undoubtedly requires a prompt and meaningful hearing following an administrative seizure of property (see, e.g., *Barry* v. *Barchi* (1979) 443 U.S. 55, 66 [61 L.Ed.2d 365, 376, 99 S.Ct. 2642]), we have found no federal cases holding such a hearing must be provided by the seizing agency as opposed to a court. Indeed, there is federal case authority supporting the director's contention due process is satisfied if the person whose property is seized can initiate a court action to recover the property or damages for its detention. (*North American Cold Storage Co.* v. *Chicago, supra,* 211 U.S. at p. 316 [53 L.Ed.2d at pp. 199-200]; *Hudson* v. *Palmer* (1984) 468 U.S. 517, 534-535 [82 L.Ed.2d 393, 408-409, 104 S.Ct. 3194]; *General Mills, Inc.* v. *Jones* (9th Cir. 1975) 530 F.2d 1317, 1323, affd. on other grounds *sub nom., Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519 [51 L.Ed.2d 604, 97 S.Ct. 1305].) However, in *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983] the United States Supreme Court invalidated the Pennsylvania replevin statute on due process grounds despite the fact "the Pennsylvania process allows a post-seizure [court] hearing if the aggrieved party shoulders the burden of initiating one." (*Id.* at p. 80 [32 L.Ed.2d at p. 570].) In striking down the statute the court noted, among other things, that pending final judgment a person could only recover the goods seized by posting a bond. "When [state] officials seize one piece of property from a person's possession and then agree to return it if he surrenders another, they deprive him of property whether or not he has the funds, the knowledge, and the time needed to take advantage of the recovery provision."[8] (*Id.* at p. 85 [32 L.Ed.2d at p. 573].)

---

[8] Cf. Code of Civil Procedure section 529, subdivision (a) which provides: "On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined such damages, not exceeding an amount to be specified as the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction."

*Fuentes*, however, did not involve seizure of property by an administrative agency.

We note *North American Cold Storage* was decided long before *Fuentes v. Shevin*, and that *Hudson v. Palmer* did not involve an administrative seizure in the usual sense.[9] Thus, from an academic standpoint, it is unclear whether the United States Supreme Court today would hold an agency can seize a person's property without providing the person any administrative hearing whatsoever.[10]

However, for our purposes the question is, indeed, academic because our Supreme Court has held emphatically and unanimously "the availability of a collateral judicial remedy [cannot] sustain a seizure procedure which provides absolutely no hearing whatsoever, either before or after the taking." (*Kash Enterprises, Inc. v. City of Los Angeles* (1977) 19 Cal.3d 294, 309 [138 Cal.Rptr. 53, 562 P.2d 1302].) In *Kash Enterprises*, a city ordinance authorized the seizure, retention and ultimate destruction of news racks without affording the owner an administrative hearing before or after the seizure. The city argued, as the state does in the present case, that because the property owner has the option of instituting an action for return of the property the owner is afforded an opportunity to be heard on the merits of the taking. (*Ibid.*) To this argument the court responded:

"Not one of the scores of recent procedural due process decisions, however, suggests that the availability of a collateral judicial remedy can sustain a seizure procedure which provides absolutely no hearing whatsoever, either before or after the taking. (See, e.g., *Sniadach v. Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Goldberg v. Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011].) Acceptance of the city's position would in effect read out almost all of the protections afforded by contemporary procedural due process doctrine, and would place on the party whose property has been taken the additional financial burden of instituting an action for the property's return. Accordingly, we conclude that subdivision (5) of the ordinance is unconstitutional insofar as it pro-

---

[9] In *Hudson*, a prison employee engaged in a "random and unauthorized" seizure and destruction of a prison inmate's property. The issue was whether this conduct gave rise to an action under 42 United States Code section 1983 by the prisoner. The court held the prisoner was not deprived of property without due process of law because state law provided a judicial remedy for the prison employee's action.

[10] In most federal cases dealing with summary deprivation of property, the agency has provided a postdeprivation hearing and the issue was whether the administrative hearing met the meaningful time/meaningful manner requirements. (See, e.g., *Barry v. Barchi, supra,* 443 U.S. at p. 66; *Hodel v. Virginia Surface Mining & Recl. Assn., supra,* 452 U.S. at p. 303 [69 L.Ed.2d at p. 33].)

vides for the seizure, retention and destruction of newsracks without affording the owner any hearing on the merits of the seizure." (19 Cal.3d at p. 309.)

*Kash Enterprises* was followed in *Menefee & Son* v. *Department of Food & Agriculture, supra*, 199 Cal.App.3d at page 782, involving the seizure of crops allegedly treated with an unauthorized pesticide. (See discussion, *supra*, pp. 1532-1533.) There, the court stated, "Bad as the failure to provide preseizure notice and a hearing may be, an even greater deficiency arises from the failure to provide any hearing whatsoever. Although the statute authorizes the seizure of a grower's property, 'it does not accord the owner the most basic safeguard demanded by due process—an opportunity to be heard on the merits of the taking, either before or after the taking.' The fact that an owner may institute a judicial proceeding for the return of the property is simply no substitute for the proceeding for the requirement that an owner be accorded a fair hearing on the merits of the seizure." (*Ibid.*; citations omitted.) (See also *Phillips* v. *San Luis Obispo County Dept. etc. Regulation, supra*, 183 Cal.App.3d at p. 379; *Bryte* v. *City of La Mesa, supra*, 207 Cal.App.3d at p. 690.)

For the reasons set forth above, we hold the director violated Leslie's right to due process of law by failing to provide Leslie's with any hearing whatsoever on the merits of the seizure.

## II. SWIMMING POOL CHEMICAL PRODUCTS INTENDED FOR USE IN DESTROYING OR MITIGATING BACTERIA, WEEDS OR OTHER PLANTS ARE PESTICIDES FOR PURPOSES OF THE ECONOMIC POISONS ACT.

It is undisputed the products involved in this action are intended to be used to kill or reduce bacteria or weeds (algae) in swimming pools. The dispute is over whether these products are pesticides, or "economic poisons,"[11] and thus subjected to regulation and taxation pursuant to the Economic Poisons Act. (Food & Agr. Code, § 12751 et seq.) At the time judgment was entered in this action, section 12753 provided: " 'Economic poison' includes any of the following: [¶] (a) Any spray adjuvant. [¶] (b) Any substance, or mixture of substances which is intended to be used for defoliating plants, regulating plant growth, or for preventing, destroying, repelling, or mitigating any and all insects, fungi, bacteria, weeds, rodents, or predatory animals or any other form of plant or animal life which is, or which the director may declare to be, a pest, which

---

[11] For purposes of the Economic Poisons Act, the terms "pesticide" and "economic poison" are synonymous. (Food & Agr. Code, §§ 11404, 12753.) We will use the term "pesticide" in this opinion to refer to substances covered by the Economic Poisons Act.

may infest or be detrimental to vegetation, man, animals or households, or be present in any environment whatsoever."[12]

 The parties agree the purpose of section 12753 is to define pesticides as substances the intended use of which is to affect pests. They disagree over the meaning of the word "pest."

The People contend section 12753 specifically defines bacteria and weeds (algae) as pests. Furthermore, it contends, bacteria and weeds are pests under the common definition of that term. The People argue a pest is a pest whether it is living in a swimming pool in Encino or a pond in Ukiah. The state has consistently interpreted the statute as applicable to bacteria in swimming pools since 1933 when the statute was amended to add bacteria to the lists of pests included in its coverage. (Stats. 1933, ch. 25.)

Leslie's argues, and the trial court agreed, the word "pest" in section 12753 should be given the same meaning as in section 5006 where it is defined as something "that is, or is liable to be, dangerous or detrimental *to the agricultural industry* of the state . . . ." (Italics added.) Because swimming pool algae pose no threat to California agriculture, they are not a "pest" for purposes of section 12753 and substances used to destroy or mitigate it are not pesticides for purposes of the Economic Poison Act. Leslie's supports this argument with citations to cases which have imported definitions from one section of a code to another and even from one code to another (see, e.g., *Gruschka* v. *Unemployment Ins. Appeals Bd.* (1985) 169

---

[12]While the appeal in this case was pending, the Legislature amended section 12753 and added a new section 12754.5. Section 12753 as amended provides: " 'Economic poison' includes any of the following: [¶] (a) any spray adjuvant. [¶] (b) Any substance, or mixture of substances which is intended to be used for defoliating plants, regulating plant growth, or for preventing, destroying, repelling, or mitigating any pest, as defined in Section 12754.5, which may infest or be detrimental to vegetation, man, animals, or households, or be present in any agricultural or nonagricultural environment whatsoever."

Section 12754.5 reads as follows: [¶] " 'Pest' means any of the following that is, or is liable to become, dangerous or detrimental to the agricultural or nonagricultural environment of the state: [¶] (a) Any insect, predatory animal, rodent, nematode, or weed. [¶] (b) Any form of terrestrial, aquatic, or aerial plant or animal, virus, fungus, bacteria, or other microorganism (except viruses, fungi, bacteria, or other microorganisms on or in living man or other living animals). [¶] (c) Anything that the director by regulation, declares to be a pest." (Stats. 1988, ch. 161, §§ 1, 2.)

In enacting this legislation, the Legislature stated, "The amendment of [section] 12753 . . . and the addition of Section 12754.5 to the Food and Agricultural Code by this act are declaratory of existing law and do not constitute a change in the law . . . ." (Stats. 1988, ch. 161, § 4.)

"While we are not bound by a subsequent legislative interpretation of existing law, it may be considered as a factor in determining the correct meaning and effect of a statute." (*J. Paul Getty Museum* v. *County of Los Angeles* (1983) 148 Cal.App.3d 600, 606 [195 Cal.Rptr. 916].)

Cal.App.3d 789, 792 [215 Cal.Rptr. 484]; *Diachenko* v. *State of California* (1981) 123 Cal.App.3d 932, 938 [177 Cal.Rptr. 164]), and with an Attorney General opinion which concluded the word "pest," for purposes of regulating agricultural pest control work under provisions of the Business and Professions Code should be defined by reference to section 100 (the predecessor to § 5006). (28 Opns.Cal.Atty.Gen. 287, 289 (1956).)

We disagree with the definition of "pest" urged by Leslie's and adopted by the trial court. There is no ambiguity in the use of the word "pest" in section 12753, at least as far as bacteria and weeds are concerned. They are legislatively declared pests under the plain language of section 12753. That section declares a pesticide includes "any substance . . . which is intended to be used . . . for preventing, destroying, repelling, or mitigating *any and all* . . . bacteria, weeds . . . or any other form of plant or animal life which is . . . a pest." [Italics added.] Thus, under the provisions of section 12753 pests include, but are not limited to, bacteria and weeds. Furthermore section 12753 is not limited to pests that are present in agricultural environments. Rather, it applies on its face to pests "which may infest or be detrimental to vegetation, man, animals or households, or be present in any environment whatsoever."

Our conclusion section 12753 applies to nonagricultural pesticides is bolstered by other provisions of the Economic Poisons Act. For example, in section 12824 the Legislature provided the Director of the Department of Food and Agriculture "shall endeavor to eliminate from use in the state any economic poison which endangers the agricultural or *nonagricultural* environment . . . ." (Italics added.) And, in section 12961 the Legislature authorized the director to "seize and quarantine any economic poison . . . detrimental to agriculture or to the *public health* . . . ." (Italics added.)

We have also considered the fact that since 1933 the agency responsible for administering the Economic Poisons Act has consistently interpreted the provisions of that law to apply to chemicals used in swimming pools. ■ It is well established "the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].) That the agency's interpretation was not clearly erroneous or unauthorized is evidenced by the 1988 amendments to the act affirming the agency's long-standing interpretation. (See fn. 12, *ante*, at p. 1538.)

The cases relied on by Leslie's are inapposite where, as here, the Legislature has defined the word "pest" differently for different purposes. (See, e.g., *Gruschka* v. *Unemployment Ins. Appeals Bd.*, *supra*, 169 Cal.App.3d at p. 792.) In section 12753 the Legislature defined "pest" to include bacteria and weeds wherever they may be found. There is no reason to import the more narrow definition of section 5006 pertaining to plant quarantine and pest control specifically designed to protect agriculture. (See Food & Agr. Code [div. 4], §§ 5001-8808; and see *County of Fresno* v. *Brix Estate Co.* (1924) 194 Cal. 85, 86-90 [226 P. 77]; *Skinner* v. *Coy* (1939) 13 Cal.2d 407, 416 [90 P.2d 296].) We also note section 5001 provides "the definitions in this article [which includes the definition of pest in section 5006] govern the construction of this division [division 4]." This provision suggests the Legislature did not intend the definition of pest in section 5006 to have universal application throughout the Food and Agriculture Code but, instead, to limit it to the subject of division 4: plant quarantine and pest control in agricultural settings. The Economic Poisons Act is not part of division 4; it is part of division 7.

■ For the reasons set forth above we hold that any chemical substance which is intended to be used in swimming pools for preventing, destroying, repelling, or mitigating any form of aquatic plant, animal, virus, fungus, bacteria or other microorganism is an "economic poison" for the purposes of the Economic Poisons Act (Food & Agr. Code, § 12751 et seq.).[13]

III. THE STATUTORY ASSESSMENT ON SALES OF PESTICIDES IS CONSTITUTIONAL ON ITS FACE AND AS APPLIED TO LESLIE'S.

■ Leslie's next contention is that even if some of its products are subject to registration and assessment as pesticides, the assessment levied against Leslie's was unlawful because it did not bear a rational relation to the benefit Leslie's derived from regulation of its products or to the enforcement costs associated with swimming pool products in general.

At the time judgment was entered in this case, section 12841 provided in relevant part: "Each registrant shall pay to the director an assessment not to exceed eight mills ($0.008) per dollar of sales for all sales of his registered and labeled economic poisons for use in this state . . . . The director may

---

[13] We agree with the trial court's conclusion the Leslie's products, subject of this litigation, are not "spray adjuvants" within the meaning of sections 12753 and 12758. Whether or not these sections are limited to products that are "sprayed," the trial court found the subject products "were not sold to be used with a pesticide as an aid to the pesticide's application or effect."

reduce the assessment if he determines that a lesser assessment rate, together with other available funds, will provide adequate revenue to administer and enforce the provisions of Division 6 (commencing with Section 11401) and this chapter, Chapter 3 (commencing with Section 14001), and Chapter 3.5 (commencing with Section 14101) of this division."

The clear purpose of the statute, as the parties agree, was to help defray the costs of administering and enforcing the provisions of the Economic Poisons Act and other laws relating to the manufacture, sale and use of pesticides. It is also fair to say the statute contemplates an assessment rate which bears a reasonable relationship to the actual cost of administering and enforcing the state's pesticide laws. This is shown by the discretion given to the director to reduce the assessment rate if a lower rate would provide adequate revenues to administer those laws.

There is nothing in the statute or the federal or state Constitutions which requires the director to fix the assessment rate according to the costs generated by each individual registrant or class of registrants.

Leslie's points to section 222 as supporting its argument assessments must be correlated to costs generated by individual registrants or classes of registrants. Section 222 provides, "The director shall keep a separate record of the classes and sources of income which are credited to, and disbursed from, the Department of Food and Agriculture Fund." We believe the purpose of this section is to carry out the provisions of section 221 which requires money paid into the fund "shall be expended solely for the enforcement of the law under which the money was derived." Because the fund contains money collected by the director from various sources for various purposes, section 222 is necessary for auditing purposes to assure the money commingled in the fund is expended for the precise purposes authorized by law.

Section 222 helps assure money received from the registration and assessment of pesticides under the Economic Poisons Act is expended solely on the administration and enforcement of the act. To read section 222 to require assessments and expenditures must be equal as to each registrant or class of registrants would be to give section 222 a construction beyond its plain language and would be inconsistent with the plain language of section 12841: "each registrant shall pay . . . an assessment not to exceed eight mills ($0.008) *per dollar of sales for all sales of his registered and labeled economic poisons.*" (Italics added.)

Section 12841 on its face requires an overall fair and equitable relationship between the assessment amount and the cost of administering and

enforcing the provisions of the act. We have found no case supporting Leslie's claim that to be fair and equitable the assessment must reflect the actual cost of administration and enforcement incurred as to each individual engaged in a regulated activity or as to each class of business engaged in a regulated activity.

Contrary to Leslie's assertion, the Economic Poisons Act was not intended to benefit Leslie's or other sellers of pesticides. The purpose of the act was to protect the public and the environment from the hazards of inherently dangerous pesticides or pesticides which were adulterated or misbranded. (See discussion, *ante*, pp. 1537-1540; and see Comment, *The Regulation of Pesticide Use in California* (1978) 11 U.C. Davis L.Rev. 273, 275-285.) Therefore the assessments imposed by section 12841 are not analogous to special assessments on real property for construction of sewers or other improvements intended to benefit specific property owners. (Cf. *City of Plymouth* v. *Superior Court* (1970) 8 Cal.App.3d 454, 464 [96 Cal.Rptr. 636] and cases cited therein.)

Leslie's reliance on *Haman* v. *County of Humboldt* (1972) 8 Cal.3d 922 [106 Cal.Rptr. 617, 506 P.2d 993] is misplaced. In *Haman*, the court held there was no rational basis for taxing locally registered fishing boats at 1 percent of their actual cash value but taxing foreign registered fishing boats at 24 percent of their actual value. (*Id*. at pp. 927-928.) In the case before us the department is not taxing Leslie's at a rate 24 times higher than the rate it applies to other pesticide dealers. To the contrary, under section 12841 all pesticide dealers are taxed at the same rate.

█ A state does not deny equal protection in its treatment of taxpayers so long as that treatment bears some rational relationship to a legitimate governmental interest. (*Magnano Co.* v. *Hamilton* (1934) 292 U.S. 40, 44 [78 L.Ed. 1109, 1114, 54 S.Ct. 599]; *Rapid Transit Corp.* v. *New York* (1938) 303 U.S. 573, 578 [82 L.Ed. 1024, 1029-1030, 58 S.Ct. 721].) Where "no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." (*Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973) 410 U.S. 356, 359 [35 L.Ed.2d 351, 354-355, 93 S.Ct. 1001].) █ Here, the state has determined the cost of regulating the sale of pesticides should be borne by each seller on the basis of its sales volume. We find nothing arbitrary or unreasonable in that determination. In taxing pesticide dealers as a class "the legislature is not required to make meticulous adjustments in an effort to avoid incidental hardships" to a particular subclass. (*Atl. & Pac. Tea Co.* v. *Grosjean* (1937) 301 U.S. 412, 424 [81 L.Ed. 1193, 1200, 57 S.Ct. 772, 112 A.L.R. 293].) We

do not believe the fabled "little old lady from Pasadena" who only drives her car a few miles every Sunday is denied equal protection of the law by having to pay the same license and registration fees as the Big Bear resident who commutes 150 miles round trip each day to go to a job in Santa Monica.

Taxes are frequently imposed on a group or class without regard to their responsibility in creating the condition the tax is intended to relieve. Leslie's argument, that it should not be taxed to pay for administrative and enforcement costs not generated by its own activities, was rejected long ago in *Carmichael* v. *Southern Coal Co.* (1937) 301 U.S. 495 [81 L.Ed. 1245, 57 S.Ct. 868, 109 A.L.R. 1327]. There an employer objected to paying a tax on a percentage of its total monthly payroll to fund an unemployment compensation system. The employer argued the tax denied it equal protection of the law, in part, because the tax bore no relation to the number of its employees receiving unemployment insurance. The court responded to this argument saying: "It is not a valid objection to the present tax . . . that the benefits paid and the persons to whom they are paid are unrelated to the persons taxed and the amount of the tax which they pay—in short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure. Appellees' contention that the statute is arbitrary, in so far as it fails to distinguish between the employer with a low unemployment experience and the employer with a high unemployment experience, rests upon the misconception that there must be such a relationship between the subject of the tax (the exercise of the right to employ) and the evil to be met by the appropriation of the proceeds (unemployment) . . . . Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied . . . . [¶] Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good. A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him." (Citations and footnotes omitted.) (*Id.* at pp. 521-523 [81 L.Ed. at pp. 1260-1261].)

Thus, Leslie's cannot complain of a denial of equal protection merely because some other seller of pesticides may have cost the state more in

administrative and enforcement proceedings but is paying less taxes than Leslie's.

Furthermore, attempting to assess administrative and enforcement costs among the thousands of pesticide dealers in the state on an individualized basis would be an administrative nightmare. The state could legitimately adopt the existing assessment system on grounds of administrative convenience. (See *Rapid Transit Corp.* v. *New York, supra,* 303 U.S. at pp. 582-583 [82 L.Ed.2d at p. 1032]; *Haman* v. *County of Humboldt, supra,* 8 Cal.3d at pp. 925-926.) If Leslie's system were adopted it would undoubtedly increase the administrative cost of determining administrative costs. Furthermore questions would arise whether the state could assess indirect as well as direct cost; if so, on what basis should indirect costs be assessed; and, how detailed must the cost breakdown be for each registrant? The system Leslie's urges, if not unworkable, might well cost the individual pesticide dealer more than the current system.

Leslie's remaining constitutional arguments require only brief discussion.

There is no merit to Leslie's claim the assessment statute is unconstitutional as applied. Leslie's complains the department has failed to register other products that could be considered pesticides such as baking soda, mouthwash and flypaper thereby excluding these products from the tax base. ■ However, even assuming baking soda, mouthwash and flypaper are pesticides, "[a] legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it." (*Carmichael* v. *Southern Coal Co., supra,* 301 U.S. at p. 509 [81 L.Ed. at p. 1253].) (Citations omitted.) Here, as we explained above, the assessment is intended to defray the cost of regulating *registered* pesticides. Because baking soda, mouthwash and flypaper are not registered pesticides the department incurs no expense regulating them. Therefore, there is a rational basis for not including them in the tax base.

Leslie's is also incorrect in claiming the department denies it equal protection by taxing its sales at the retail level while taxing its competitors' sales at the wholesale level. The record does not support this claim. The record shows that when Leslie's sells its products it is taxed on the amount of the sale. Leslie's is not taxed when it transfers its product from its manufacturing division to its retail division because no consideration passes from the retail division to the wholesale division. We fail to see how Leslie's is damaged by the director's assessment method. If Leslie's were assessed on

the "sale" of its product by its wholesale division to its retail division, it would be subject to a double assessment when its retail division sells the product to a customer.

Finally, Leslie's claims the department's assessment regulations were adopted in violation of its due process right to notice. ■ There is no due process requirement of personal notice to a person affected by a ratemaking regulation. (*Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823].)

For the reasons explained above, the tax assessment authorized by section 12841 is constitutional on its face and as applied to Leslie's.

## IV. LESLIE'S IS NOT ENTITLED TO ATTORNEY'S FEES UNDER GOVERNMENT CODE SECTION 800 FOR SUCCESSFULLY CONTESTING THE DEFENDANTS' SEIZURE OF ITS PROPERTY.

The trial court awarded Leslie's $1,500 in attorney's fees under Government Code section 800 which provides in relevant part, "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding . . . where it is shown that the award, finding, or other determination of such proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his official capacity, the complainant if he prevails in the civil action may collect reasonable attorney's fees . . . ."

The court found "[t]he conduct of Department employees, acting in their official capacity, in their review, registration, seizure, and quarantine of Leslie's oxidizer, was arbitrary and capricious . . . ." Because we have held the defendants properly required registration of Leslie's oxidizer as a pesticide the only basis for an attorney's fee award under Government Code section 800 would be the unconstitutional seizure and quarantine of Leslie's oxidizer without opportunity for a hearing.

■ It is clear, however, the unconstitutional denial of a hearing does not support an award of attorney's fees under Government Code section 800. Leslie's declaratory relief action challenging the seizure of its oxidizer is not an "appeal [from] the award, finding, or other determination of [an] administrative proceeding." (Cf. *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 321, fn. 25 [152 Cal.Rptr. 903, 591 P.2d 1] [plaintiff not entitled to award under Government Code section 800 for successfully challenging unconstitutional ordinance].) As explained in *Ferris* v. *Los Rios Community College Dist.* (1983)

146 Cal.App.3d 1, 11 [194 Cal.Rptr. 16] "The terms 'award, finding, or other determination' and the term 'administrative proceeding' imply it is not every decision of an administrative official which, on judicial review, may occasion an award of attorney's fees . . . . Government Code section 800 is inapplicable except where review is sought of action taken as a result of an administrative hearing required or provided by law." (Citations omitted.) (Accord *Los Angeles Police Protective League* v. *City of Los Angeles* (1985) 166 Cal.App.3d 55, 67 [212 Cal.Rptr. 251].)

We appreciate the irony of disallowing attorney's fees when the state unconstitutionally denies the plaintiff an administrative determination and allowing attorney's fees when the state makes an administrative determination but the determination is arbitrary and capricious. Nevertheless, the plain words of the statute and their uniform judicial interpretation compel that result.

### DISPOSITION

The judgment is reversed as to defendants' jurisdiction to regulate and impose assessments with respect to Leslie's swimming pool chemicals; as to the amount of assessments and refund thereof; as to refund of registration fees relating to Leslie's swimming pool chemicals; and as to attorney's fees under Government Code section 800. The case is remanded to the trial court to enter a new and different judgment declaring the rights and duties of the parties consistent with the views expressed in this opinion. In all other respects the judgment is affirmed.

Each party shall bear its own cost on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied October 24, 1990, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 16, 1991.