[No. S022080. Dec. 10, 1992.]

WILLIAM F. KNOX et al., Plaintiffs and Appellants, v.
CITY OF ORLAND et al., Defendants and Respondents.

## COUNSEL

Ronald A. Zumbrun, Anthony T. Caso, Richard M. Stephens and Meredith M. Chang for Plaintiffs and Appellants.

Jean Rumiano, McDonough, Holland & Allen, Harriet A. Steiner and Robert S. Fisher for Defendants and Respondents.

B. C. Barmann, County Counsel (Kern), Mark L. Nations, Deputy County Counsel, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Steven L. Mayer, Richards, Watson & Gershon, Marsha Jones Moutrie, Robin D. Harris, Sturgis, Ness, Brunsell & Sperry and Samuel A. Sperry as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BAXTER, J.**—This case concerns a special assessment[1] for park maintenance levied by the City of Orland for fiscal year 1989-1990 under the Landscaping and Lighting Act of 1972 (hereafter the Landscaping and Lighting Act or the Act) (Sts. & Hy. Code, § 22500 et seq.).[2] We granted review to determine whether the Act authorizes the imposition of special assessments for the maintenance of existing public parks, and to evaluate the validity of the City of Orland's assessment as measured against the special

---

[1] We use the terms "special assessment" and "benefit assessment" interchangeably throughout.

[2] Unless otherwise indicated, all further statutory references are to the Streets and Highways Code.

tax limitations found in article XIII A, section 4 of the California Constitution. We conclude that the maintenance of existing parks is clearly within the scope of improvements authorized by the Act, and that the assessment in question is a valid benefit assessment that is not subject to article XIII A, section 4.

### THE LANDSCAPING AND LIGHTING ACT OF 1972

Since 1972, the Landscaping and Lighting Act has authorized local legislative bodies[3] to establish benefit-related assessment districts and to levy assessments for the construction, installation and maintenance of certain public landscaping and lighting improvements.

To establish an assessment district under the Act, a local legislative body must first pass a resolution which proposes the formation of the district, describes the desired improvement and assessment district, and orders a city or county engineer to prepare and file a report detailing the plans and specifications for the improvement and estimating its costs. (§ 22585.) If the legislative body approves the engineer's report, it must then adopt a resolution declaring its intention to order formation of the assessment district and hold a properly noticed public hearing. (§§ 22587, 22588.) At the public hearing, the legislative body is required to consider all oral statements and written protests. (§ 22590.) Subject to certain limitations, the legislative body may then order changes in any of the matters provided in the engineer's report, including changes in the improvement, district boundaries or proposed assessment. (§ 22591.) If the legislative body determines that a "majority protest," as defined by the Act, does not exist or is properly overruled, it may then adopt a resolution ordering the improvement and formation of the district. (§§ 22592, 22593,[4] 22594.)

An assessment district created pursuant to the Act "shall consist of all territory which, as determined by the legislative body, will be benefited by the improvements and is to be assessed to pay the costs thereof." (§ 22503.) Once an assessment district has been formed, each annual assessment levied thereafter requires its own engineer's report and noticed public hearing prior to imposition. (§§ 22620-22631.)

---

[3]For purposes of the Act, a "legislative body" means "the legislative body or governing board of any local agency." (§ 22529.) At all times relevant herein, a "local agency" was defined to mean "a county, a city and county, a city, or a special district." (Stats. 1972, ch. 630, § 2, p. 1169.)

[4]A "majority protest" exists where written protests representing property owners owning more than 50 percent of the area of assessable land within the proposed district have been filed and have not been withdrawn. In the event of a majority protest, the proceedings for formation of the district are required to be abandoned unless the legislative body, by a four-fifths vote, overrules the protest. (§ 22593.)

FACTS AND PROCEDURE

In May 1989, the City Council of the City of Orland initiated proceedings to form a special assessment district under the Act. In the resolution proposing to form the district, the city council described the nature of the proposed improvements as "Maintenance and servicing of lights, playground equipment, landscaping, irrigation systems, public restrooms, bleachers, and other improvements at [five named city parks]." The boundaries of the district were described by listing four school districts, exclusive of lands within the boundaries of the Mendocino National Forest.[5] Based on statistics gathered by the parks and recreation commission and others, the City of Orland (hereafter the city) determined that residents living within the four school districts were equally benefited by the parks.[6]

The engineer's report ordered by the city proposed that each parcel in the district be assessed $24 per dwelling unit for the 1989-1990 fiscal year. That figure was obtained by dividing the number of dwelling units (4,298) into the total costs of park maintenance and district formation ($103,152). Since assessments were calculated on a per dwelling basis, some parcels were assessed in multiples of $24, while commercial and undeveloped properties within the district were not assessed at all. After reviewing the engineer's report, the city council adopted a resolution declaring the intention to order the formation of the assessment district.

At a noticed public hearing, the city council entertained oral comments both from supporters and opponents of the proposal. Twenty written protests were received. After determining that a majority protest within the meaning of the Act did not exist,[7] the council adopted a resolution, by a vote of four to one, finding that the engineer's report fairly and properly apportioned the cost of the improvements to each parcel in the assessment district in proportion to the estimated benefits to be received by each parcel. The resolution ordered the improvements and the formation of the district.

Plaintiffs, four owners of residential property within the assessment district, sued the city and its council members for declaratory and injunctive relief. The complaint alleged, inter alia, that the $24 charge was invalid as a

---

[5]The assessment district contains 42,300 acres of land, and geographically consists of the entire City of Orland and portions of outlying lands in Glenn County.

[6]These statistics showed that residents in the outlying county accounted for roughly 55 percent of the regular usage of the park facilities.

[7]The 20 people who submitted written protests owned a total of 142.42 acres—this figure represented less than 1 percent of the entire 42,300 acreage of the proposed district.

benefit assessment, and that instead it was a special tax which in turn was invalid for failure to receive a two-thirds vote of the electorate.[8]

The city moved for summary judgment, contending there was no triable issue of material fact as to the validity of the assessment. The trial court granted the motion on the procedural ground that plaintiffs failed to respond to each of the facts identified by the city as undisputed, and on the ground that there was no triable issue of fact. Judgment was entered on May 11, 1990.

The Court of Appeal did not rule on the procedural aspect of the trial court's ruling, but affirmed the judgment on the basis that the 1989-1990 assessment was a valid special assessment.

DISCUSSION

### I. *Scope of the Landscaping and Lighting Act.*

■ The first issue in this case concerns the scope of improvements authorized under the Landscaping and Lighting Act. The city and its amici curiae contend the Act authorizes the imposition of assessments for the maintenance of existing parks.[9] Conversely, plaintiffs contend the Act permits assessments for the maintenance of only those parks constructed pursuant to the Act.

The types of improvements authorized under the Act are delineated in section 22525. That section provides in pertinent part: " 'Improvement' means *one or any combination of the following*: [¶] (a) The installation or planting of landscaping. [¶] (b) The installation or construction of statuary, fountains, and other ornamental structures and facilities. [¶] (c) The installation or construction of public lighting facilities . . . . [¶] (e) *The installation of park or recreational improvements,* . . . [¶] (f) *The maintenance or servicing, or both,*[10] of any of the foregoing. . . ." (Italics added.)

Plaintiffs contend that under section 22525, maintenance of a park is not an authorized improvement unless the park itself was installed pursuant to

---

[8]The complaint also alleged that the $24 charge violated plaintiffs' rights to equal protection. Plaintiffs appear to have abandoned this claim.

[9]We received three amicus curiae briefs in support of the city: one on behalf of the Cities of Agoura Hills, Blythe, Carson, Cudahy, La Puente, Palmdale, Rancho Palos Verdes, Seal Beach, South El Monte, South Gate and West Hollywood, one on behalf of various entities designated as "Specified Cities, Specified Counties, the City and County of San Francisco, and the County Supervisors Association of California" (hereafter Specified Cities), and one on behalf of the County of Kern.

[10]"Maintenance" is defined to mean "the furnishing of services and materials for the ordinary and usual maintenance, operation, and servicing of any improvement, including: [¶] (a) Repair, removal, or replacement of all or any part of any improvement. [¶] (b) Providing

the Act. Relying on section 22525, subdivision (f), which specifies that one type of authorized improvement is the "maintenance or servicing, or both, *of any of the foregoing*," plaintiffs argue that every item which constitutes "the foregoing" is the "installation" of something, such as landscaping, statuary, fountains, ornamental structures, lights or parks. (Italics added.)

We disagree with plaintiffs' strained reading of section 22525. That section expressly states that for purposes of the Act, "improvement" means "*one or any* combination" of the improvements listed in its various subdivisions. (Italics added.) In turn, section 22525, subdivision (f) specifies "maintenance or servicing" as one such improvement. Given the language of section 22525, it is reasonably apparent that maintenance and servicing are improvements in their own right and are not dependent upon an installation under the Act. Fairly read, section 22525, subdivision (f) provides that a permissible improvement for purposes of the Act includes the maintenance or servicing of any of the categories of physical improvements which are listed in the preceding subdivisions, regardless of whether such physical improvements are originally installed pursuant to the Act.

While plaintiffs are unable to point to anything in the Act that casts doubt on our reading, we ascertain that one of its statutory provisions undermines theirs. Significantly, plaintiffs' attempt to construe section 22525 so as to disallow use of the Act for the formation of an assessment district to maintain physical improvements not initially installed pursuant to the Act is clearly at odds with section 22605, which explicitly allows local legislative bodies to flexibly utilize the Act to consolidate into a single assessment district any existing lighting, maintenance *or* tree planting districts that previously had been formed pursuant to other assessment schemes such as the Improvement Act of 1911 (commencing with § 5820) and the Tree Planting Act of 1931 (commencing with § 22000). (§ 22605, subd. (d)(2).)

Finally, our construction of the Act effectuates the Legislature's intent that the Act "provide[ ] an *alternative* procedure for making the improvements [t]herein authorized . . . ." (§ 22502, italics added.) In this regard, legislative documents submitted by the city disclose that the underlying purpose of the Act was to offer a simplified alternative procedure to the "cumbersome and complicated" provisions of other assessment schemes

for the life, growth, health, and beauty of landscaping, including cultivation, irrigation, trimming, spraying, fertilizing, or treating for disease or injury. [¶] (c) The removal of trimmings, rubbish, debris, and other solid waste." (§ 22531.)

"Servicing" is defined to mean "the furnishing of: [¶] (a) Electric current or energy, gas, or other illuminating agent for any public lighting facilities or for the lighting or operation of any other improvements. [¶] (b) Water for the irrigation of any landscaping, the operation of any fountains, or the maintenance of any other improvements." (§ 22538.)

such as the Improvement Act of 1911 (§ 5000 et seq.) and the Tree Planting Act of 1931 (§ 22000 et seq.). (Assem. Com. on Local Government analysis (May 25, 1972) of Assem. Bill No. 1268 (as amended May 8, 1972), at p. 1; see Sen. Local Government Com. staff analysis (undated) of Assem. Bill No. 1268 (as amended July 6, 1972), at p. 1.) Notably, these other acts authorize assessments for the maintenance of various landscaping and lighting improvements without reference to whether such improvements are initially financed and installed thereunder.[11] That being the case, our reading of section 22525 is better suited than plaintiffs' for advancing the Act's goal of providing an "alternative" to these other acts with respect to the maintenance, as well as the installation or construction, of certain designated landscaping and lighting improvements. We further note that our view is consistent with the Legislature's desire that the Act "be liberally construed to effectuate its purpose." (§ 22509.)

Aside from their narrow reading of section 22525, plaintiffs identify nothing else contained in the Act or in its legislative history that supports their position. Accordingly, we conclude that the maintenance of an existing park is an improvement authorized under the Act.

## II. *Validity of the Park Maintenance Assessment.*

In June 1978, the voters of California adopted an initiative measure (Proposition 13) which amended the California Constitution to add article XIII A. Article XIII A contains four principal sections,[12] each designed to interlock with the others to assure effective property tax relief. (*Amador Valley Joint Union High School Dist.* v. *State Board of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) ▮ The next issue in this case concerns the validity of the $24 charge for park maintenance as

---

[11]Under the Tree Planting Act of 1931, authorized improvements have been defined as the planting, maintenance *or* removal of trees and any and all acts necessarily incident thereto. (Stats. 1941, ch. 79, § 1, p. 1016; see current §§ 22006, 22087.) Under the 1941 codification of the Improvement Act of 1911, and its 1961 amendments, any public improvement eligible for construction funding under the 1911 act is also eligible thereunder for maintenance funding. (Stats. 1941, ch. 79, § 1, p. 880; Stats. 1961, ch. 2179, § 1, p. 4516.) Therefore, the Improvement Act of 1911 permits a city to order the formation of *either* an assessment district for both the construction and maintenance of improvements *or* a separate assessment district to finance "the expenses of maintaining and operating . . . any or all other improvements *such as are permitted to be constructed herein* . . . ." (§ 5821, italics added; see § 5820.) Since parks and parkways are improvements authorized to be constructed under the 1911 act (see § 5101, subd. (b)), they may also form the basis for maintenance assessments whether or not they were originally constructed thereunder.

[12]Section 1 sets the maximum amount of ad valorem tax that may be imposed on real property. Section 2 places a limitation on the assessed value of real property. Section 3 imposes restrictions on the method of changing state taxes. Finally, section 4 restricts the imposition of special taxes by mandating a two-thirds voter approval requirement.

measured against one of those four sections, namely section 4, which restricts the ability of a city to impose "special taxes" by mandating a two-thirds voter approval requirement.[13]

As a preliminary matter, we note plaintiffs concede that California Constitution, article XIII A (hereafter article XIII A) is not intended to limit "traditional" benefit assessments. Indeed, the Courts of Appeal have uniformly held that the article XIII A's tax limitations are not violated by legitimate special assessments. (See, e.g., *City Council of the City of San Jose v. South* (1983) 146 Cal.App.3d 320 [194 Cal.Rptr. 110] [hereafter *South*] [special assessment for maintenance of landscaped median islands on public streets not an ad valorem tax within meaning of art. XIII A, § 1, nor a special tax within meaning of art. XIII A, § 4];[14] *American River Flood Control Dist. v. Sayre* (1982) 136 Cal.App.3d 347 [186 Cal.Rptr. 202] [hereafter *Sayre*] [art. XIII A does not impinge upon agency's ability to levy special assessments for maintenance of flood control facilities]; *Solvang Municipal Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545 [169 Cal.Rptr. 391] [hereafter *Solvang*] [special assessment for local improvement which directly benefits specific real property does not come within one percent limitation on real property ad valorem taxes established in art. XIII A]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777] [hereafter *Malmstrom*] [art. XIII A, §§ 1 and 4 do not apply to special assessments levied under the Improvement Act of 1911 and the Municipal Improvement Act of 1913].)

Plaintiffs do not contend the above cases were decided wrongly. Rather, they argue that the instant charge for park maintenance constitutes a special tax, as opposed to a legitimate special assessment. In evaluating this contention, we first examine the distinctions between the two public financing mechanisms.

### A.

The characteristics of a special assessment are not in dispute. A special assessment is a " " "compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative

---

[13]Article XIII A, section 4 (hereafter section 4) provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

[14]In *South*, the city levied the subject assessment pursuant to its home rule charter powers, as opposed to a statutory assessment scheme. Nonetheless, the reasoning in that case is applicable here since article XIII A applies to both charter cities and general law cities such as Orland.

authority for defraying in whole or in part the expense of a permanent public improvement therein . . . ." ' [Citation.]" *(San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161 [228 Cal.Rptr. 47, 720 P.2d 935].) ■ In this regard, a special assessment is "levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement." *(Solvang, supra,* 112 Cal.App.3d at p. 554.) "The rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. [Citation.]" *(Id.,* at p. 552.) Thus, "[a]lthough a special assessment is imposed through the same mechanism used to finance the cost of local government, in reality it is a compulsory charge to recoup the cost of a public improvement made for the special benefit of particular property." *(Id.,* at p. 553.)

A tax, on the other hand, is very different. Unlike a special assessment, a tax can be levied " 'without reference to peculiar benefits to particular individuals or property.' " *(Fenton* v. *City of Delano* (1984) 162 Cal.App.3d 400, 405 [208 Cal.Rptr. 486], citing Black's Law Dictionary (5th ed. 1979) p. 1307, cols. 1-2.) Indeed, "[n]othing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." *(Carmichael* v. *Southern Coal Co.* (1937) 301 U.S. 495, 521-522 [81 L.Ed. 1245, 1260-1261, 57 S.Ct. 868, 109 A.L.R. 1327], fn. omitted; see also *Leslie's Pool Mart, Inc.* v. *Department of Food & Agriculture* (1990) 223 Cal.App.3d 1524, 1543 [273 Cal.Rptr. 373] [citing same].) The same holds true even for a special tax which, for purposes of section 4, is a tax levied to fund a specific governmental project or program *(Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 15 [2 Cal.Rptr.2d 490, 820 P.2d 1000]; *Malmstrom, supra,* 94 Cal.App.3d at p. 984 [a special tax "need not . . . specifically benefit the taxed property" in the same manner as a special assessment].)

Therefore, while a special assessment may, like a special tax, be viewed in a sense as having been levied for a specific purpose, a critical distinction between the two public financing mechanisms is that a special assessment must confer a special benefit upon the property assessed beyond that conferred generally.[15] ■ Accordingly, if an assessment for park maintenance improvements provides a special benefit to the assessed properties, then the assessed property owners should pay for the benefit they receive. If

[15]In *City of Los Angeles* v. *Offner* (1961) 55 Cal.2d 103, 108-109 [10 Cal.Rptr. 470, 358 P.2d 926], we further observed that if the assessment exceeds the actual cost of the

it does not, the assessment effectively amounts to a special tax upon the assessed property owners for the benefit of the general public. (See *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24, 30 [148 P. 217].)

B.

Plaintiffs' position essentially is that the Landscaping and Lighting Act's authorization of benefit assessments for park maintenance represents a legislative device for achieving an "end run" around article XIII A. They, in effect, contend that, as a matter of law, a special assessment is never appropriate for financing the maintenance of a park because a park is not the type of improvement which can be viewed as conferring a special benefit upon real property. They also assert that the maintenance of an existing public improvement is not an improvement for which a special assessment may be imposed. As we will demonstrate, these arguments are without merit.

Plaintiffs first argue that public parks, by their nature, do not provide special benefits to property.[16] Although plaintiffs cite no authority standing for this proposition, they seek to distinguish parks from what they describe as "traditional" improvements such as street lights, sewers, sidewalks and flood control. In their view, while street lights, sewers, sidewalks and flood control may, by their nature, confer a peculiar and special benefit to property, the primary characteristic of a park is that it benefits only people, that is, members of the general public. To bolster this argument, plaintiffs contend that the city's basis for the assessment, i.e., statistics showing that persons living within the district boundaries use the subject parks to the same degree, supports the notion that the benefit of parks is solely to people, not property.

Plaintiffs' basic argument that a special assessment is never appropriate to fund park improvements is unconvincing. Significantly, plaintiffs' attempt to differentiate between street lights, sewers, sidewalks and flood control as constituting proper subjects for special benefits, and public parks as matters of such a general nature as not to justify a special assessment, is virtually identical to an argument rejected nearly a century ago by the United States Supreme Court in *Wilson* v. *Lambert* (1898) 168 U.S. 611, 616 [42 L.Ed. 599, 601, 18 S.Ct. 217] (hereafter *Wilson*), and cases cited therein. In *Wilson*, property owners argued that a park that was open and dedicated to the general public was not a proper subject for special assessment. The Supreme

improvement, the exaction is a tax and not an assessment. In this case, plaintiffs do not contend that the assessment exceeds the actual cost of the improvements at issue.

[16]Notably, plaintiffs do not argue that the assessment at issue confers no special benefit upon their own particular properties. Rather, they contend the assessment is devoid of special benefit to all properties in the district, including their own.

Court disagreed: "The residents and property holders of the District of Columbia must be regarded as coming within the class of beneficiaries; and, so far from being injured by the declaration that the park shall also have a national character, it is apparent that thereby the welfare of the inhabitants of the District will be promoted. Whatever tends to increase the attractiveness of the city of Washington, as a place of permanent or temporary residence, will operate to enhance the value of the private property situated therein or adjacent thereto." (168 U.S. at pp. 616-617 [42 L.Ed.2d at p. 601].)[17]

 In California, there is a lengthy history of legislative and judicial recognition that parks constitute proper subjects for special assessment. Parks, like street lights, sewers and sidewalks, have long been considered by the Legislature to be within the domain of special assessments. (See, e.g., Stats. 1909, ch. 538, p. 1066; Stats. 1923, ch. 56, § 1, p. 104, [amending Stats. 1911, ch. 397, § 2]; Stats. 1925, ch. 419, p. 849; Stats. 1941, ch. 79, § 1, p. 836.) Likewise, at least one judicial decision before the adoption of Proposition 13 upheld the use of special assessments with regard to parks. (*O.T. Johnson Corp.* v. *County of Los Angeles* (1932) 128 Cal.App. 440 [17 P.2d 792] [upholding use of special assessments for acquisition of lands for park purposes]; cf. *J.W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745 [203 Cal.Rptr. 580] [upholding validity of ordinance which authorized a "facilities benefit assessment" levying a special assessment on properties benefited by street improvements and parks within a new development]; *City of San Diego* v. *Holodnak* (1984) 157 Cal.App.3d 759 [203 Cal.Rptr. 797] [hereafter *Holodnak*] [upholding validity of a "facilities benefit assessment" used to finance certain public facilities in new development, including neighborhood and community parks].[18]) Since, as even plaintiffs concede, Proposition 13 was not intended to limit benefit assessments in

[17]Plaintiffs cite no subsequent authority that casts doubt on *Wilson*'s reasoning, nor have we found any. They argue, however, that *Wilson* is irrelevant because it deals with the Fifth Amendment of the United States Constitution and because the protections afforded by article XIII A of the California Constitution did not exist in 1898 in the District of Columbia. We are not persuaded. As amicus curiae County of Kern points out, a special assessment may not be imposed without or in excess of a special benefit to the assessed property without violating the Fifth Amendment. (See *Furey* v. *City of Sacramento*, 24 Cal.3d 862, 874 [157 Cal.Rptr. 684, 598 P.2d 844], app. dism. and cert. den. (1979) 444 U.S. 976 [62 L.Ed.2d 403, 100 S.Ct. 476].) Consequently, a special assessment based on the requisite special benefit complies with both the Fifth Amendment and article XIII A, while a special assessment without a special benefit conflicts with each of these constitutional provisions.

[18]The court in *Holodnak* observed: "The neighborhood and community parks will specially benefit the North City West properties because of their location in North City West. While the general public will be able to use the parks and benefit by having parkland available within the city, the parks will be of particular benefit to the immediately surrounding North City West community [citation]." (157 Cal.App.3d at p. 763.)

their historical manner of use, we see no basis for rejecting these long-standing legislative and decisional determinations that parks are legitimate subjects for special assessment.

Plaintiffs next argue that only the construction of a new public improvement, as opposed to the maintenance of an existing improvement, confers a special benefit sufficient to justify a special assessment. This argument is similarly unavailing because the propriety of a special assessment for maintenance also has been recognized for decades by both the Legislature and the courts. (See, e.g., Stats. 1927, ch. 543, § 1, p. 909; Stats. 1941, ch. 79, § 1, p. 880; Stats. 1953, ch. 192, § 4, p. 1182; *South, supra,* 146 Cal.App.3d 320 [maintenance of landscaped median islands on public streets]; *Sayre, supra,* 136 Cal.App.3d 347 [operation and maintenance of flood control system]; cf. *Russ Bldg. Partnership* v. *City & County of San Francisco* (1988) 44 Cal.3d 839 [244 Cal.Rptr. 682, 750 P.2d 324] [upholding assessment-like funding mechanism to pay for maintenance of municipal mass transit systems]; *Roberts* v. *City of Los Angeles* (1936) 7 Cal.2d 477 [61 P.2d 323] [upholding assessment to pay for operation of street lighting improvements on ground that statutory authorization included repair and maintenance].) This makes perfect sense, for regular maintenance of a physical improvement may operate to renew and preserve the special benefit attributable to the improvement. Conversely, the closure, damage or impairment of a physical improvement due to a lack of maintenance may well result in the elimination or diminishment of special benefit.

In light of the foregoing, we reject the argument that a benefit assessment for park maintenance is never appropriate as a matter of law, and we find untenable any suggestion that the Act itself was improperly devised by the Legislature. However, that is not the end of our inquiry. We must now examine the validity of the city's determination of special benefit in this case.

### C.

The Landscaping and Lighting Act provides in pertinent part: "Any proceedings taken under this part and any assessment levied pursuant thereto shall not be invalidated for failure to comply with the provisions of this part if such failure does not substantially and adversely affect the rights of any person. All determinations made by the legislative body pursuant to this part shall be final and conclusive in the absence of fraud or prejudicial abuse of discretion." (§ 22509.)

■ Prior to the passage of Proposition 13, we stated the standard for judicial review of a special assessment in *Dawson* v. *Town of Los Altos Hills*

(1976) 16 Cal.3d 676 [129 Cal.Rptr. 97, 547 P.2d 1377] (hereafter *Dawson*), as follows: "A special assessment finally confirmed by a local legislative body in accordance with applicable law will not be set aside by the courts unless it clearly appears on the face of the record before that body, or from facts which may be judicially noticed, that the assessment as finally confirmed is not proportional to the benefits to be bestowed to the properties to be assessed or that no benefits will accrue to such properties." (16 Cal.3d at p. 685; see also *White* v. *County of San Diego* (1980) 26 Cal.3d 897, 904 [163 Cal.Rptr. 640, 608 P.2d 728].) We distilled this standard from decisions dating back to the early part of this century (e.g., *Duncan* v. *Ramish* (1904) 142 Cal. 686, 692 [76 P. 661]; *Larsen* v. *San Francisco* (1920) 182 Cal. 1, 15 [186 P. 757]; *Rutledge* v. *City of Eureka* (1925) 195 Cal. 404, 416-417 [234 P. 82]), and observed that the underlying justification for the narrow scope of judicial review is firmly rooted in the notion that the establishment of a special assessment district takes place as a result of a peculiarly legislative process. (*Dawson, supra,* 16 Cal.3d at pp. 684-685.)[19]

As a threshold matter, we address plaintiffs' request to reevaluate the standard of review announced in *Dawson, supra,* 16 Cal.3d 676, in light of *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] (hereafter *Beaumont Investors*). *Beaumont Investors* involved the interaction between development fees and Government Code section 50076, a legislative exemption to section 4 for fees which are not levied for general revenue purposes and which do not exceed the "reasonable cost" of providing a service or regulatory activity for which such fees are charged.[20] In that case the court concluded, inter alia, that because the purpose of section 4 is to impose a general restriction upon the power of local authorities to impose special taxes, "it rightfully follows that the local agency which seeks to avoid the general rule should have the burden of establishing that it fits the exception [contained in Government Code section 50076]." (*Beaumont Investors, supra,* 165 Cal.App.3d at p.

---

[19]Of course, while the local legislative body is the ultimate authority empowered to make the final determination as to the lands benefited and the amount of benefit properly assessed, such a determination is made after a full hearing accorded to all interested persons to make objection as they see fit. (See *Dawson, supra,* 16 Cal.3d at p. 684; see also *South, supra,* 146 Cal.App.3d at p. 332 [due process requirements of notice and hearing apply to special assessments].)

[20]The question in *Beaumont Investors* was whether a facilities fee, which in effect was a user fee designed to reimburse a water district for future costs of constructing new water system facilities necessitated by new development, fit within Government Code section 50076. Although the water district failed to produce any evidence supporting its calculation of the fee, it argued that the plaintiff had the burden of proving the fee was unreasonable. (165 Cal.App.3d at pp. 235, 238.) The court disagreed, holding that the facilities fee was invalid because the district had failed to develop a record from which costs reasonably related to the development could be determined. (*Id.,* at p. 235.)

235.) Although the court in *Beaumont Investors* was addressing the validity of a development fee, petitioners argue for the application of a similar burden of proof analysis in the context of benefit assessments.

We are not persuaded by the *Beaumont Investors* decision (*supra*, 165 Cal.App.3d 227) to deviate from the traditional standard of review which we reaffirmed in *Dawson*, (*supra*, 16 Cal.3d 676). Neither section 4, nor Government Code section 50076, has any application to benefit assessments. Unlike the situation in *Beaumont Investors*, the benefit assessment in question is not presumptively a special tax under section 4. Thus, it is not necessary that the assessment fit into the statutory exception for the city to prevail. We see no basis for applying the *Beaumont Investors* analysis in the context of benefit assessments.[21]

Under *Dawson, supra*, 16 Cal.3d 676, we confine our review in this case to the record before the city and judicially noticed facts. Here the record shows that the subject improvements are described in the city engineer's report as including the maintenance of the pools, playgrounds, picnic and barbecue areas, bicycle paths, baseball and softball fields, tennis and volleyball courts, and horseshoe pits located at the various parks. The city's studies of park use confirmed that residents from all geographical areas of the district used these park facilities to roughly the same degree, and therefore received nearly equal benefit from the availability of such facilities. These facilities were not duplicated by any other nearby parks, and the only parks in closer proximity to the properties within the district had no basic recreational improvements. Based on the studies of park use, the city proposed to spread the total cost of the improvements ($103,152) among all parcels within the assessment district based on the number of dwelling units thereon. This resulted in a $24 per dwelling unit assessment, from which owners of undeveloped or commercial property would be effectively exempt.

In conformance with the statutory requirements of the Landscaping and Lighting Act, the city held a duly noticed hearing to give all affected property owners the opportunity to oppose the assessment district and

[21]Moreover, as indicated in footnote 20, *ante*, the court in *Beaumont Investors* seemed sensitive to the concern that if the taxpayer were forced to prove that a development fee was "not reasonably related to the service for which it was imposed, local agencies would gain a litigational advantage by *not* undertaking, or at least not recording, any effort to relate the cost of the service to the fee charged." (165 Cal.App.3d at pp. 235-236, italics in original.) This is much less of a concern in special assessment cases. Assessment statutes, including the Landscaping and Lighting Act, typically require legislative bodies, prior to levying an assessment, to conduct noticed public hearings and to publicly review and approve an engineer's report of the cost of improvements and the method of apportioning costs. (See §§ 22550-22595.)

present their input as to whether or not the proposed assessment would be proportional to the benefits conferred upon their properties. Unfortunately, we are not provided with a transcript or any other record of the evidence or statements received at that hearing. It is clear, however, that plaintiffs did not attend the public hearing and did not specify their objections to the assessment district at that time. Even if we presume plaintiffs are not thereby barred from challenging the sufficiency of the city's benefit determination,[22] the record contains no indication of any evidence presented to the city challenging the improvements, the boundaries of the assessment district or the proposed assessment. Indeed, contrary to plaintiffs' opinions on the matter, the overwhelming majority of affected property owners did not express opposition to the formation of the assessment district and did not protest the city's proposal to include their lands within the designated area of benefit.[23] After holding the public hearing, the city passed a resolution making the basic and ultimate determination that the city engineer's report "has fairly and properly apportioned the cost of the improvement to each parcel of land in the assessment district in proportion to the estimated benefits to be received by each parcel, respectively, from the improvements."

Based on this record,[24] we see no basis for invalidating the city's determination of benefit under *Dawson*, *supra*, 16 Cal.3d 676. The record contains no evidence contradicting the city's benefit determination, and no facts that otherwise tend to show nonproportionality or absence of benefit to the assessed properties.

Moreover, we cannot say from the record that the assessed properties will in fact receive no special benefit from the improvements here in question.

[22] In the proceedings below, the city claimed, inter alia, that plaintiffs' action was barred due to laches, undue delay, and plaintiffs' failure to submit written protests prior to the city's confirmation of the assessment. As the merits of these claims were not previously decided by the trial court or the Court of Appeal, we decline to decide them for the first time here.

[23] The city mailed notice of the public hearing to approximately 3300 property owners, along with an informal "ballot" asking owners whether they supported formation of the assessment district and the proposed assessment. Of the 910 ballots returned, 453 owners indicated they supported the assessment district and assessment and 457 owners indicated they did not. At the public hearing on district formation, only 20 property owners—owning a total of less than 1 percent of all the land in the proposed district—submitted written protests. Although none of the plaintiffs attended the public hearing or submitted written protests, three of them returned ballots indicating they did not support the assessment district.

[24] Plaintiffs urge us to also consider a sworn declaration from an appraiser stating that, in his opinion, the creation of the assessment district would not result in an increase in market values. This declaration merits no consideration because our review is limited to evidence which appears on the face of the record before the city council or from facts which may be judicially noticed. (*Dawson*, *supra*, 16 Cal.3d at p. 685.) Plaintiffs have made no attempt to show that this evidence was before the city council, nor is it a matter appropriate for judicial notice.

While renters, commercial and undeveloped property owners and persons residing outside the district are able to use the park facilities, and the community at large benefits by the presence of five parks in the area, the residential property owners are uniquely benefited by the proximity of these facilities to their properties.[25] The record establishes no reason for doubting that the desirability of the assessed residential properties is enhanced by the presence of well-maintained public pools, playgrounds, picnic and barbecue areas, bicycle paths, baseball and softball fields, tennis and volleyball courts, and horseshoe pits in the area for the use and enjoyment of residents. Moreover, having a wide assortment of facilities such as a pool, a playground and a tennis court readily accessible in nearby public parks means that the assessed owners may enjoy the benefits of having such improvements available for use by their families and/or tenants while avoiding the expense of privately installing and maintaining such improvements on their own properties. Finally, in the absence of evidence to the contrary, we may presume that the presence of well-maintained open park land contributes to the attractiveness of the district and thereby also enhances the desirability of the properties therein.

In summary, the record fails to establish that the assessment in question, as finally confirmed, is not proportional to the benefits bestowed on the properties assessed or that no benefits accrue to such properties. Under *Dawson, supra*, 16 Cal.3d 676, the city's determination of benefit, as set forth in its resolution approving the engineer's report, must be deemed conclusive in the absence of any contradictory evidence in the record.[26]

## D.

Finally, we address plaintiffs' contention that it is inconsistent with the theory underlying benefit assessments for the city to now finance park maintenance by assessments after having previously used tax revenues to pay for such maintenance. In plaintiffs' view, the city's admission that operation of the parks was in jeopardy due to lack of funds in its treasury, coupled with its decision to "shift" funding for park maintenance to a special assessment, violates the spirit of section 4, which "is aimed at limiting local

[25]Although plaintiffs suggest abstractly that certain property within the district located some 20 miles outside the city could not possibly benefit by its proximity to the parks, there is no indication in the record that the owner of such property disagreed with the city's inclusion of the property within the designated area of benefit.

[26]Although the issue is not presently before us, we question whether a special assessment would be valid under *Dawson* if there exists evidence in the record which contradicts the local legislative body's benefit determination and indicates that such determination was arbitrary, capricious, or entirely lacking in evidentiary support. (See *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].)

governments' ability to replace funds reduced by other sections of [article XIII A] by shifting to other types of taxes." (*Malmstrom, supra,* 94 Cal.App.3d at p. 983.)

Contrary to plaintiffs' suggestion, the city's decision to change funding sources for an improvement is not fatally inconsistent with the theory underlying benefit assessments. ■ In the first place, we recognized long ago that a public entity's choice initially to fund an improvement out of tax revenues should not prevent it from deciding later that funding by special benefit assessment would be more appropriate. (*Irish* v. *Hahn* (1929) 208 Cal. 339, 348 [281 P. 385, 66 A.L.R. 1382] [city's original decision to acquire a utility system with bond funds did not foreclose financing its reconstruction by special assessment].)[27] Plainly, if an improvement provides a special benefit, that benefit exists whether or not the public entity was correct in first financing it out of its general fund.

■ Moreover, the record is uncontroverted that the city decided to shift from general fund financing to benefit assessment after studies confirmed that residents in the outlying county were accounting for roughly 55 percent of the regular usage of the park facilities without having to pay for maintenance of those facilities. We cannot say that the spirit of section 4 is violated where, as here, a city shifts to benefit assessments in order to equalize the benefits and burdens of park improvements and to end the windfall enjoyed by residential property owners outside the city who use, and whose property benefits from, such improvements.[28]

■ Although the drafters of section 4 clearly did not intend to adopt a definition that could readily permit its circumvention (see *Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 11), it is equally clear that they did not intend to interfere with benefit-related assessments. Accordingly, section 4 does not preclude a public entity from shifting funding for an improvement from its general fund to special assessment, so long as the requisite special benefit exists.

---

[27]This is especially so where, as here, there has been no factual or legal showing that the public entity's prior fiscal decision was necessarily linked to a determination by the public entity that the improvement at issue is of only general benefit.

[28]We note that plaintiffs do not challenge the legality of the city's formation of a special assessment district which extends beyond its borders. Section 22506 of the Landscaping and Lighting Act authorizes the extension of an assessment district beyond the boundaries of a city pursuant to provisions of the Improvement Act of 1911 (commencing with section 5115). As required by those provisions, the city obtained the requisite consent of the Glenn County Board of Supervisors to include the designated portion of the county's unincorporated territory in the proposed assessment district benefit area. (§ 5117.)

## CONCLUSION

We conclude that the park maintenance assessment challenged in this case is valid. It was levied in accordance with proper statutory authority, and concerns improvements traditionally considered to be within the domain of special assessments. Because the record contains no evidence contradicting the city's special benefit determination, and because we cannot say from a review of the record that the assessed properties will receive no special benefit or nonproportional benefit from the improvements, the 1989-1990 assessment levied by the city may not be set aside.

The judgment is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Arabian, J., and George, J., concurred.

**KENNARD, J.,** Dissenting.—Is the maintenance of an existing park an "improvement" within the meaning of the Landscaping and Lighting Act of 1972 (the Act), Streets and Highways Code section 22500 et seq.?[1] Because I conclude that maintenance of preexisting facilities cannot be considered an "improvement" within the meaning of the controlling statute, I respectfully dissent.

## BACKGROUND

The City of Orland initiated proceedings to create a special benefit assessment district under the Act in order to fund certain "improvements." The improvements were described by the city council as "[m]aintenance and servicing of lights, playground equipment, landscaping, irrigation systems, public restrooms, bleachers and other improvements at [five named city parks]." Determining that the parks benefited each resident in the district equally, the city proposed to assess each parcel $24 per dwelling unit for the 1989-1990 fiscal year. Four owners of residential property in the proposed district sued the city, contending the benefit assessment was invalid under the Act, and in any event it was a special tax that was invalid for failure to receive approval by a two-thirds vote of the electorate, as required by article XIII A, section 4 of the California Constitution. The trial court granted the city's motion for summary judgment, and the Court of Appeal affirmed.

## DISCUSSION

The Act authorizes creation of benefit assessment districts to finance improvements. Section 22525 provides, in pertinent part: " 'Improvement'

---

[1]All further statutory references are to the Streets and Highways Code unless otherwise indicated.

means one or any combination of the following: [¶] (a) The installation or planting of landscaping. [¶] (b) The installation or construction of statuary, fountains, and other ornamental structures and facilities. [¶] (c) The installation or construction of public lighting facilities . . . . [¶] (d) The installation or construction of any facilities which are appurtenant to any of the foregoing . . . . [¶] (e) The installation of park or recreational improvements . . . . [¶] . . . [¶] (f) The maintenance or servicing, or both, *of any of the foregoing.*" (Italics added.)

As noted above, the issue is whether maintenance of preexisting facilities can be an "improvement" within the meaning of section 22525. The applicable rules of statutory construction are well settled. The goal of statutory construction is to determine and effectuate legislative intent. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323]; accord, e.g., *Altaville Drug Store, Inc.* v. *Employment Development Department* (1988) 44 Cal.3d 231, 238 [242 Cal.Rptr. 732, 746 P.2d 871].) In doing so, we employ a number of canons of statutory construction, which are "aids to ascertaining probable legislative intent." (*Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10 [183 Cal.Rptr. 647, 646 P.2d 809].) No single canon of statutory construction is an infallible guide to correct interpretation in all circumstances. But it is proper to begin the task of statutory interpretation by examining the words of a statute, as these are usually the best indicator of the Legislature's intent. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) If the language is clear, courts should construe a statute according to the usual and ordinary meaning of the words, unless to do so would produce absurd results (*Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272]), or there is some other compelling reason not to do so (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140]).

The residents' argument is straightforward. They contend that the statute "does not authorize assessments for maintenance unless it is maintenance of improvements installed pursuant to the Act." Although the statute does include "maintenance" as an improvement, it is limited to maintenance of new improvements installed under the Act. That is, under the statute maintenance can be an improvement only if it is "maintenance or servicing, or both, of any of the foregoing." (§ 22525, subd. (f).) And every "improvement" that falls under "the foregoing" is "installation" of something under the Act.

In my view, this argument is persuasive. As a matter of common usage, "maintenance" is not ordinarily encompassed within the concept of "improvement." And the statutory language is plain and clear: maintenance is

only an improvement when it is maintenance of an "improvement" within the meaning of section 22525. The majority's conclusion that "maintenance and servicing are improvements in their own right and are not dependent upon an installation under the Act" (maj. opn., *ante*, at p. 139) flatly contradicts the statutory language.

The plain meaning of the statutory language supports the residents' construction of the statute, and under our cases such plain language should not be lightly cast aside. The majority, however, labels the residents' argument "strained" and rejects it, giving two reasons.

First, the majority says that the residents' interpretation of the statute "is clearly at odds with section 22605, which explicitly allows local legislative bodies to flexibly utilize the Act to consolidate into a single assessment district any existing lighting, maintenance or tree planting districts that previously had been formed pursuant to other assessment schemes . . . ." (Maj. opn., *ante*, at p. 139, italics omitted.)

This analysis by the majority makes little sense. Although section 22605 does authorize consolidation of assessment districts, section 22605 has nothing to do with whether maintenance of preexisting facilities is an "improvement" within the statutory language of section 22525.

The majority does not make its analysis on this point explicit, but apparently comes to its conclusion based on the following reasoning: If the city *had* consolidated the lighting assessment district with another maintenance district under section 22605, there would be no question that maintenance would be assessable. Therefore, we should not distinguish between assessments under different schemes, since assessment districts can always be consolidated.

But saying that the districts could have been consolidated is not the same thing as saying that the districts have been consolidated, which is what section 22605 unmistakably requires. The city did not consolidate the district with another district, and is not entitled to benefit from a legal process it freely chose not to employ.

The second argument set forth in the majority opinion is based on section 22502, which states: "This part provides an alternative procedure for making the improvements herein authorized and shall not apply to or affect any other provisions of this code." The majority reasons that since the Legislature intended that the Act provide an alternative to other assessment schemes, and since other assessment schemes allow assessments for maintenance

without regard to whether the thing maintained is new, it follows that it does not matter whether an assessment for maintenance under section 22525 maintains a new improvement. (Maj. opn., *ante*, at p. 140.)

The problem with this argument is that it is circular. Section 22502 states the Act provides "an alternative procedure for making *the improvements herein authorized . . . .*" (Italics added.) What are the improvements "herein authorized"? They are defined by section 22525, which strictly limits maintenance improvements, as shown above. If the Legislature had intended to authorize under the Act "any improvement that is authorized under any other benefit assessment scheme," it certainly could have done so. It did not.

The interpretation of the statute proposed by the residents adheres to the meaning of the statutory language itself. Reading the statute in this fashion does not lead to absurd consequences. And the majority has failed to set forth any compelling reason why this commonsense construction should not be followed.

Public parks can provide significant benefits to the communities they serve, enhancing the lives of residents and visitors alike, provided the parks receive sufficient and timely maintenance. This case results from one city's attempt to establish a reliable and adequate source of funding to maintain its parks. Although the city's objective is commendable, the means it has chosen is both unnecessary and legally foreclosed. As I said earlier, the city could have consolidated the lighting assessment district with another maintenance district under section 22605, and thereby obtained an adequate source of funds for park maintenance that would have been immune from legal challenge under the Act. By choosing to proceed in a different fashion, the city has invited and received a protracted legal battle, focused on the meaning of section 22525. In construing this statute, our task as judges is not to advance the cause of parks, or to advance any cause, but to interpret and apply the statute in the manner that best effectuates legislative intent. Applying established rules designed to determine legislative intent, I conclude that section 22525 does not authorize assessments to maintain facilities that were not installed under the Act.

Accordingly, I would reverse the judgment of the Court of Appeal.[2]

---

[2]Because I would resolve this case solely on statutory grounds, I do not address the additional question whether the assessment is subject to the special tax limitations of article XIII A, section 4 of the California Constitution.